is David Grigsby, Joseph Shepard and Barb Mendel-Levy, David Siebert versus BofI Holdings, Inc. and BofI Investors Group. So with that, I believe we're ready to proceed. So, Mr. Lieberman? Yes, and good morning, Your Honors. Good afternoon, Judge Hellerstein. On behalf of appellants, I'm Jeremy Lieberman from Pomerantz, LLP. The district court properly ruled that the April 18, 2016 statement denying that BofI had made a $7 million loan to Jason Galanis was a false and misleading statement, as well as the March 31, 2017 statement that the company was unaware of any money laundering investigation, that too is a false and misleading statement. And we allege, with respect to those statements, that there were two corrective disclosures. In October 26, 2016, disclosure that indeed there was a loan of $7 million to Jason Galanis, and then on October 25, 2017, New York Post article disclosing the existence of a money laundering investigation into BofI. And we allege, with respect to those two disclosures, that there were unfortunately, the court really misconstrued Dura and its progeny in the Ninth Circuit. The court held that while this information, the information with respect to the loan, was already out in the market in publicly available information, and with respect to the investigation, the court assumed that somebody can make a FOIA request, and that information could have come out earlier, and therefore there was no lost causation because that information, in some manner, may have been able to come into the market, in a quote-unquote information-hungry market. Mr. Lieberman, can you point me to any evidence that the seeking alcohol article revealed to the market that was not taken from any publicly available source? Your Honor, it is correct that all of the information was, in disparate parts, somewhat available publicly. But as the court in Gilead noted, as the court in Apollo noted, you could have scenarios where there's disparate information throughout the various sources throughout America, but there's an analysis point of view where someone distills that information and presents and makes a conclusion, and that's exactly what... We know that? Yes. This strikes me as your weaker argument, so I want to get the other one. Can you concisely tell me why the information in this case was so hard to put together to connect these dots? Well, the dots that are connected with respect to, we're speaking about the Golanus loan, is that correct? Okay, with respect to the Golanus loan, you had a relationship of Knightbrook insurance to a large Bofi shareholder, which had a relationship to New Olympia, which had a relationship to Golanus, who had a relationship to Tobin Smith, who had a relationship to Greg Garibantis, information received from Equities Magazine. Then you had also a loan from Bofi to ECCSPE to Emerald Creek to Golanus, and then ECCSPE takes that in an underhanded manner, takes that collateral and gives it to Bofi. You have... You're telling us what we know from the briefs, and I appreciate that, but your time is ticking. So, why in this case, is it too many leaps, too many dots to connect, or what is it, concisely please? Well, speaking solely about the Golanus loan, you had disparate sources of information, some of which you needed to pay money in order to access, like the UCC information, and there is a process of... There was a denial made by the company, and there's a process then of hiring an investigator, which is what occurred, and then ultimately learning the information and making a conclusion. The market, I mean, what the courts holding would say is if there was an Exhibit 55 in a brief, and the last page of that exhibit contained information, the market is deemed to know that information, and that's not a realistic view, and actually Dura makes very clear that market processes different information in different ways, very much impacted by how it's focused on the SEC investigation, and so the money laundering, that information was not publicly available. There's no evidence that it was publicly available. We talk about that because I think this is very interesting. I read the district court's ruling to say, you know, anybody else could have made the same FOIA request that basically the pro reporter did, but I don't think we know that anybody did do that. We know there are a few earlier FOIA requests, but we don't know what was requested or what was released, but please correct me if I'm wrong about that. Well, that's absolutely correct. There is no evidence other than the three that we allege there was a FOIA request. There's no evidence as to those FOIA requests which were closed around the same time that the FOIA requests were closed for the New York Post reporter as to what information was contained in the closing, and there is evidence alleging the complaints that a prior FOIA request made by Craig Hollum in 2016 did not reveal the information regarding the FCC investigation. So we show that the FCC doesn't always provide the information requested in FOIA requests, very much likely because there's an ongoing investigation. There's all kinds of exemptions available under FOIA, but we don't have that information here, so we don't know what was requested or what was released. Well, we know what was requested by Craig Hollum in 2016, and that was not released, the investigation regarding the money laundering, and then we know the existence of the three investigations. So the first time... Telling us what wasn't released, of course, in that example, that doesn't get us to where we need to be here, because the question is what was publicly available. Yes. Let me ask you a slightly different question. Just as a matter of law, you can take whatever hypothetical you want, but it strikes me that this really sort of central premise of the district court's ruling is treating discoverable information as though it actually looks at Dura, and Dura sometimes references public information, and sometimes talks about publicly available. It's clear if you look in the context of Dura, it talks about the dissemination of information, what information is publicly known, but then it sometimes uses the word available. It's obvious in context, it's about what's known. So let's just take that out, forgive me for interrupting, but again, if we think of FOIA as publicly available information, then we know at least as of the date of the probes report, that whatever it is probes got was publicly available, right? We know that at the time of the New York Post's disclosure, we know by that time it had become publicly available, of course. The question is, there's no evidence it had become publicly available any moments before that disclosure, and so the court assumed an information-hungry market would somehow get this information, but there's no evidence that it was publicly available, and even if it was publicly available but not public, this court in this circuit would have to make a leap and say, well, if it's publicly available, the markets seem to have known it even though it's not public, and that's a leap this court has never made before, but I really would want to... You're breaking it down into two points, I think. Yeah. The court assumed, in your view, and we're going to hear from the other folks, of course, is that whatever it was that was released was publicly available sometime earlier. Yes. And then treating it as though it had been... was actually public. Public, yes. The district court makes two leaps here. One, that any information somehow was publicly available without a shred of evidence makes that assumption, and B, the court says then what's publicly available is deemed public, and I would say both. There's no... there's no... there's no allegation or anything... any judicially noticeable information that she says was publicly available prior to that date, A, and B, there's... that leap is incorrect as a matter of law. Dura simply requires, and the second restatement of torts cited by Dura says, when you look at loss causation, allegations are when information becomes known to the market, not knowable, but known, the stock price declines. That's Dura, and that's the question asked by... by... by the court in SolarCity that said the ultimate question is, is when the information comes out related to the statement, does the stock price decline? That's... that's what we have in our allegation. And the court... I'd like to ask... I'd like to ask you, Mr. Lieberman. Sure. What statement of the company was false and misleading because of the failure to say something that was required to be said, so it was not to be false and misleading? Okay, with respect to the April 18th, 2016 misstatements, the company denied Earhart's allegations relating to the Golanus loan. Earhart had... It said that there was an investigation, internal investigation, that... that came to the conclusion that there was nothing to that charge. He said, yeah, it said Earhart's allegations are disconnected from reality, and Earhart... Earhart alleged there was a $7 million loan from Golanus to... So the question is... is whether the Denton's conclusion was that or something different? Well, it's... it's... it's Denton... And it also said... it also said there was no enforcement action. And there was no... And that's... we're not challenging that statement. We're not challenging that on appeal. On appeal, we're not challenging the issue regarding whether there's an enforcement action or not. So your challenge is to the statement that Denton's concluded that there was no... nothing wrong... nothing to the Earhart allegations? That... that... no, I'm not challenging even Denton. The company said that Earhart's allegations related to the Golanus loan were disconnected from reality. And the court properly ruled that... that that was false because there was a $7 million loan. That's... that's false statement A. False statement B is the company, with the New York Post, in March 31, 2017, alleged a money laundering investigation, which was indeed had been going on for 16 months. The company said they've received no purported money laundering investigation. They learned then on... in... in October 25, 2017, there indeed was a money laundering investigation. And that's... and that's the... that's the statement is... is false as a court... They said no enforcement action, didn't they? Didn't the company say no enforcement action? On March 31, 2017, the New York Post says the company has received no indication of, and has no knowledge of, regarding such purported money laundering investigation. Well, since when does a New York Post article have to be stated differently by some other company? Well, the company made a statement to the market saying that they've never received... that they have no knowledge of investigation, and the company indeed was under investigation. So they didn't necessarily have to admit that on their own, but when... when... if they go and make a proactive statement there's no investigation, and indeed there is investigation, that is a false and misleading statement. So what is the company's statement that there was no investigation? That's March 31, 2017, in reaction to the New York Post allegation. And you think both the Seeking Alpha article and the New York Post article, these statements sufficiently relate back? Oh, I mean, do the disclosures relate back sufficiently to the statements? Is that the question? Yes. Yeah, so let's break it... let's break it down. The... the... the Seeking Alpha disclosure discloses, and the court said plausibly, that there was a loan from Galanis, from Bofi to Galanis, and the company denied Earhart's allegations of loans to criminals. That clearly relates back. Galanis is a criminal. That's... Well, but... you know, because the... your opposition here contends that the Seeking Alpha article, you know, didn't assert that the B of I had made any loans to Galanis, only that they had acquired collateral. I think it was of 7 million loan made by another lender to an individual later convicted of a crime. So what's your best response to that argument? Sure. It is with respect that they denied all of Earhart's allegations. One of Earhart's key allegations was loans to criminals. That's the false statement. The relate back is a showing that there was financing made from Bofi to... to ECC, to Emerald Creek to Galanis, and then they take the collateral. It's obviously they set up... set up a transaction where they could loan money to Galanis. So money went from ECC to Emerald Creek to Galanis, 7 million dollars, and they take the collateral. If I give someone money and I take their collateral, I made a loan to them. Now it's... they did A to B and B to C to jump some steps to make it look less... less sinister, but that's what it was. That's a loan to Galanis. I wonder we give five more minutes. I'd like to explore loss causation, and these are just about out of time. Yes. I have two minutes for rebuttal. Is that... is that okay? Let's... let's see. Go ahead. So you're alleging that there was a 15% price drop following the Seeker Alpha article, but what is the reaction of the market to the corrective disclosure, and when was the corrective disclosure? The corrective disclosure occurred on October 26, 2016, and the market... That was the Seeker... that was the Seeking Alpha article. Correct, and in the two days immediately thereafter... two trading days immediately thereafter, the stock declined $3.12, which was a two-day decline of 14.53%. But that's in reaction to the disclosure of the article. It's not in reaction to any correction. Well, it's a reaction to the article, which states that there was a loan from Galanis to... from... from... from Bofi to Galanis. That's the... Yes, but... That's what the article's about. When was the company's correction? When was the correction of the company's statement? That day. The... when the... when the article came out, Seeking Alpha comes out and discloses for the first time, despite Bofi's denials, there is a loan from Bofi to Galanis. There's full statement correction on October 26, 2016. How... what was the correction? The correction was the... the... the Seeking Alpha disclosed for the first time that there was a loan from Bofi to Galanis. That's the... that's the disclosure that was made by somebody else, not by the company. So that's... if the issue is... is that the company didn't admit it, the company denied it. The company continued to lie. But Dura... What form was the... what form was the denial? The company the next day... this... the court had... we didn't appeal this issue. The court the next day said there's no law supposition for that statement later on. The company the next day denied that there was a loan from Bofi to Galanis. So the disclosure... Just to tell you where I am, I can't distinguish between the small price drops that you talk about, 5% and 0.01% and 15% from the natural price fluctuations of the company. The... the record shows that the... the company's stock price fluctuated between $18.36 at one point and $27.58 at another point. So what makes us think that... that the loss was affected by anything the company said? Because there was no material... this was a two-day decline of 14% in two days. That's what we're looking at. From... for $21.48 to $18.36. Not much of a decline on the NASD. That's... that's... for Bofi that's a 15% decline. People don't like losing 15% of their... of their... of their investments. If that's the... if that's the issue, then that's something to... to replead in front of the district court. Because that's not why the district court ruled against us. The district court ruled against us because it said that the information was already somehow publicly available. So if we want to remand on that point, that's fine. I don't think there's... I don't think there's any really question with respect to Ninth Circuit precedent that if you have a decline of 15% in the immediate aftermath of a disclosure, that meets Dura, SolarCity, Restatement of Torts by any definition. And so that's... that's for an economist to deal with as summary judgment as to whether or not there's some... that... that was a materially distinct decline. It is. It is statistically significant. And we could prove that. If we need to allege that, we will. But that's not why the judge alleged that. And we do allege it was a statistically significant decline during the class period. We allege that. That if you... statistically those were... that was one of the largest declines for the entire class period. Judge Hallerstein, did you have any other questions? No. Okay. I'll give you two minutes for your rebuttal. Okay. Okay. You're... you're over your time now. I'm over my time. Okay, fine. Thank you. Thank you. Yes. Good morning, your honors. This is John Stege from Shepard Mullen on behalf of the defendants at Belize. Um, I have to call to the attention of the court that Mr. Lieberman just changed the case on appeal. Page 18 of plaintiff's brief, opening brief, makes very clear that plaintiffs are only appealing the district court's rulings on loss causation as to two statements,  okay? Page 18, footnote two. The two statements on appeal are the statements on April 18th, stating that Earhart's allegations are disconnected from the reality of a highly compliant and well-performing business, highlighted by the absence of enforcement actions. And two, March 31, 2017, indicating that B of I had received no indication of a DOJ-led money laundering investigation. The statement denying a loan to Golanus was expressly excluded from this appeal. The other thing I need to raise is the comment that Mr. Earhart had complained about this loan to Golanus. A, he didn't, and the record will reflect that. And I would only highlight that Mr. Earhart actually left the company before this loan to Golanus ever took place, based on the information in the record. So with those corrections of the record and what's on appeal, I would like to focus, if I could, on the question that I think is on everyone's mind here, which is the lack of connection between the alleged corrective disclosures and the statements they purportedly try to correct. And in that regard, this court's decisions in Metzler and in Oregon, public employees versus Apollo, I'll call it Oregon because there are two Apollo cases, this court's decisions in those cases explain what is necessary for a disclosure to be corrective. As the court held, in Metzler, you can't plead correction by euphemism. And that to be corrective, the disclosure, and this is in Oregon, the disclosure essentially must demonstrate the falsity of the statement it is supposed to be correcting. There needs to be congruence. And even plaintiff's own authority that they just submitted, the unpublished decision out of the 11th Circuit, Luzak, quoting Meyer, also out of the 11th Circuit, even they said, although a disclosure need not precisely mirror the early representation, in order to have a corrective effect, it must at least relate back to the misrepresentation and not some other negative information about the company. Okay, with that standard in mind, let's look at the alleged corrective disclosures. For the statement about denying Earhart's allegations by essentially saying that they, by essentially denying them by saying that they were disconnected from the reality of a highly performing business and highly compliant and well-performing business, the corrective disclosure is the blog article about this Golanus loan. And I would urge the court to read that blog article if it hasn't already. It talks about connections. It's sort of a conspiracy theory, six degrees of separation. It's got cartoons of a little rocket ship and a little red flag. But at the end of the day, it doesn't accuse BFI of having made a loan. It keeps asking questions and it keeps asking investors to do their own investigation as well. Even before you get into the fact that it's all publicly available information, you don't have to get there. The fact is that article does not render false BFI's statement that Earhart's allegations, which have nothing to do with a loan to Golanus, are not connected to the reality of a company that has never had a compliance issue, that has never had an enforcement action, and that was highly performing. And by the way, those allegations by Earhart made five years ago. To this day, there is still no enforcement action about that or any other issue. I appreciate everything that you're saying, but I wanted to, because of the time here, Mr. Lieberman relies a lot on Gilead. And I guess I want to ask you, how would you distinguish the facts of this case from the facts in Gilead and other cases like it? Why is this not an exception to here? And I want to put that Gilead in the right context, which is the process by which you get to Gilead. And bear with me. The basic fraud on the market presumption applies in this case. We know that. And it applies from the beginning of this case. A legal presumption that publicly available information is impounded in the stock price. It is not a presumption that all investors know all information. It's not a constructive knowledge concept. It is a concept that the information hungry market, people go and look for information and trade on it. And then it is impounded in the stock price and the market is deemed to rely on the integrity of the stock price. With that in mind, that is a presumption that applies to all publicly available information. This court recognized that in Nuveen. Footnote one of Nuveen makes it very clear. The price in an open and developed market usually reflects all available information. Right. Because. But that's the word. Available. Right. When does it become available? Doesn't this ruling treat information that could be made available as though it's already been made available? So what does available mean in this context? Does available. Right. The Supreme Court in basic when it talked about information and availability and I put we put this in a brief. Bear in mind 1988 available. An S.E.A. A form 10 K was available because it was in a file room in Washington, D.C. That's available because the concept was. Mr. What the Seeking Alpha article did was to put together a lot of information, which if one spent a lot of time with all the commentary and the notes to a financial statement might have been put together. But the Seeking Alpha article put it together and the corrective disclosure is that we're not such a kind of company. We don't we don't lend to criminals. We don't do any of those things. And here if we had done it, you could expect enforcement action and we haven't had one. And what the company is false and misleading about and I'm enlarging on Mr. Lieberman's concepts is that we're a clean company. We do everything legal. Well, you may be legal and lending to a criminal, but you didn't answer the question. Are you lending to a criminal? And that was a question that was hard to discover in terms of the transaction. That's the allegations I get from the second amended complaint. Understood. The point is that that the correction was the thing that caused the market to change. And that correction caused the 15 percent drop. That's Mr. Lieberman's point. I'm not sure about the chronology, but that's his point. Understood. And so here to answer the specific question on Gilead, I don't want to leave that hanging. The issue with Gilead is, which means that it doesn't apply here, is in addition to the hard work that goes in, there needs to be additional expertise. And by the way, the hard work isn't just doing basic research into public sources. The presumption says that investors are doing that already. That the professional investors, all the way to people betting on a hunch, are relying on the market price. And the presumption is that investor, that even a professional hardworking investor from day one, will get that information and impound it in the stock price. It then, for plaintiffs, they need to rebut that presumption under 9b and plead facts, which is what happened at Gilead. Although that wasn't a 9b standard yet. And so what do you have in Gilead? You have not just a lot of data, you have additional expertise on top of that, combined with a whole bunch of other corroborative disclosures from additional sources. Gilead is a very rare exception in this world. And in our perspective, the plaintiffs don't need that on the Seeking Alpha article, because there's no special expertise. Coming back to Judge Hellerstein, if I might. There was a premise of your question I have to dispute. The bank, the company here, by saying that Earhart's allegations are disconnected from the reality of a highly compliant and well-performing business, is not, should not, cannot, and could not fairly be perceived by the market as a guarantee of, we will never have a compliance violation. We will never lend to a person who has a criminal background. Goodness knows, if we said that, that would create some serious discriminatory issues for us. I think the plaintiffs are, I understand why, reading way too much in the representation they are claiming is false to suggest that a single loan to a criminal, which the Seeking Alpha article does not prove, or just to ask a question, but even if it did, even if EOI made a loan to Mr. Galanis, who by the way was convicted of fraud after the loan was made by ECC, even if it had, that is not necessarily inconsistent with the statement, we have a highly compliant and well-performing business. Those two facts can exist at exactly the same time, and what we know from Ronconi, Vantive, and other cases from this court, to demonstrate falsity, there has to be a necessary inconsistency. Otherwise, the state of affairs, using Brody, is a highly compliant business with no allegation of the contrary. Does the company know of the ongoing investigations by the Treasury Department? So, in terms of the investigations... By Justice, there are three allegations of investigation, ECC, Department of Justice, FDIC, and others, I think three. Three plus others. Did the company know of anything other than the SEC? It depends on the timing, of course, because the SEC investigation... At the time of the Seeking Alpha article. Okay, so, again, the statement, allegedly false, is a specific statement in response to the allegation there's an FBI, or excuse me, a DOJ-led money laundering investigation. That was the specific issue that B of I was denying. We have no knowledge... What was the denial? The denial was there was no such investigation? We are... We have no knowledge of a Department of Justice-led money laundering investigation. That was the statement. Later on, it turns out there was an SEC investigation that had closed months earlier. But the district court found that denial misleading, right? To cut to the chase. That's why the district court found that denial misleading. Well, I think that the district court made a mistake on that, because those are companies, as you know, and Your Honor has helped us control what they say. Just in response to Judge Hellerstein's question, that is, all I'm asking for clarification of it, that is why the district court found that denial misleading, yes? I assume so, yes. I say it's a little unclear because the court sort of went over that a little quickly. And our position of court... I'm sorry. ...Hellerstein's question. I'm just... Thank you for the clarification. I guess if not a money laundering investigation by the SEC, then what other investigation of BFI into the March 31st, 2017 press release was there? By the time of that press release, I'm not aware of any. Bear in mind that the denial of knowledge of the DOJ-led money laundering investigation was specifically in response to the New York Post report of the existence of one. It wasn't a spontaneous... I'm sorry, it wasn't a spontaneous... We are aware of no other investigations. The company never disclosed, nor should it, nor does it have a duty to. We know that from Metzler, among other cases. A duty to disclose pending investigations. There are several decisions from the Southern District of New York, Lionsgate, Richmond v. Goldman Sachs, which make very clear that companies have no obligation to disclose pending investigations. The point is when they say... Because sometimes they lead to no material effect. But when they deny, and if they know there is, they're making a misleading statement. You are right. There's no affirmative duty to disclose. But if there is a disclosure of denial, then there's something wrong. If the denial is of something that has happened... SEC investigation and FBI investigations are two different things. Did the company know of any laundering investigation? No, still does not, to this day. Three years later, still no. No indictments, no enforcement actions, no actions taken by the government. Three to five years later, and still nothing. I don't think you've answered Judge Hellerstein's question. What you're answering is that there hasn't been any action response. He's asking whether there was any knowledge by the company of a 16-month investigation. By the SEC? That's very important, Your Honor. I'm sorry. Yes, it had knowledge of an SEC investigation. Right, Counsel. And this is why, although your time really is ticking down. In fact, now it's ticking back up. But that is why the district court found that denial to be misleading. And it's taken quite a lot of time to get that out. Judge, could I ask one question, please? Sure, of course. Counsel, you haven't had an opportunity to respond to what I'm hoping you're going to get to, which is on the FOIA request. And this word, available, publicly available, that phrase, it seems to me to take on a unique and has been applied uniquely here. So what is the case that is the strongest support for your position? That information that could be released pursuant to FOIA ought to be treated as, because it's releasable, it ought to be treated as publicly available, so it's already released. Sure, and Your Honor, I'm doing all this to try to answer every question. Forgive me if we're going astray here. There are no specific cases on this. This is an issue I think could well be of first impression. I do too. So could you take your shot at explaining to us, why is that a correct ruling? That information that is subject to disclosure ought to be treated as disclosed. I appreciate that once it's disclosed, we assume the market is very efficient, but it's this junction I'm trying to get at. Sure, and it comes back to first principles of basic and the fraud of the market theory, which is, again, it's premised on the idea that the mass of investors out there, no one can be presumed to know every piece of material information. That would be a ridiculous presumption, right? The fraud of the market presumption is not about that. It's not about everybody knows everything. It's that there are investors who go to dig up information, trade on it, and impound it in the stock price. Easterbrook and Schleicher, different context, of course, goes through that, I think, pretty well from the perspective of the way that the theory, the semi-strong theory has professional investors, people digging for information and trading on it before it's disseminated, disclosed, whatever you want to call it, to the broader market. And it's the act of the... Can I just ask, Judge McGee is being very indulgent with me here. Go ahead. I just ask, what is the limiting principle? At what point should we treat something as public? Well, I think the right analysis is if a person in the public has the ability to get it, it is publicly available, triggering a burden on the other side to demonstrate, to rebut that by saying, even if it was publicly available, it was too complex for the market, that's Gilead. I think that's where the state of the law is right now. You've answered my question. Thank you so much, Judge McGee. Sure, of course. All right. Thank you very much. Appreciate your oral argument here today. Mr. Lieberman, you have two minutes. Okay, thank you. And I'll use my two minutes to make three points. One is, my adversary said that there was no money laundering investigation. That's incorrect. By October 2016, the SEC was investigating residential mortgages made to non-resident aliens, which the New York Times previously stated was raised anti-money laundering concerns. You don't just launder money, you have to use a mechanism to launder money. What you do is you give a mortgage to a non-resident alien who may or may not be a politically exposed person. And that's a way of getting money out of the country and into those hands. And that is the investigation. There are allegations in the complaint that clearly tie those residential mortgages to AML concerns, anti-money laundering concerns. That's point one. Point two is, my adversary had said the loan to Golanus was not made by the April 16, 2016 misstatement, April 18, 2016 statement. That statement is false. Paragraph 117 of the complaint makes clear that the loan to Golanus and that funding was made in early 2015. That's my point two. My point three is that there's been a lot of discussion about BASIC, publicly available versus public. And let's just see what's very clear here. It's clear that BASIC and Halliburton aren't speaking about publicly available information. BASIC says, the fairly modest premise of the market professionals generally consider most publicly announced material misstatements about companies. Publicly announced. More statements saying the dissemination of material misrepresentations. The misrepresentations need to be disseminated. Halliburton itself talks about the information to trigger the BASIC presumption, it must be public. If you look at, if you just do a word search on the word public and publicly announced and publicly disseminated in BASIC and Halliburton, you'd find those statements and those decisions more than a dozen times. That's the assumption made. And if this court would then look, as a matter of first impression, on the issue regarding publicly available versus public, this is the wrong time to do it. There's no evidence that the SEC investigation was publicly available before the date of disclosure. We actually alleged that Craig Holland tried getting this information beforehand. Mr. Lieberman, I appreciate you're over your time on that, but I want to give you one minute addition, taking this opportunity, because I mean, law causation is one, but you haven't addressed Scienter at all, and I just want to give you an opportunity, one minute, to best argue for that. It's clear at the time that the company made the statement, there was tremendous scrutiny on BOFI at the time of the misstatements by April of 2016 regarding loans to criminals and regarding investigations. That was, starting the New York Times article in 2015, that was the raging question regarding BOFI. Are you under investigation? Are you making loans to criminals? Are you a dirty organization? At the time that the company itself makes, saying that Earhart's allegations regarding loans to criminals is false, it's clear that they know about their loans to Galanis. Galanis is associated with characters who are clearly associated with Garibrands, the CEO. It's obvious he knows about these loans. He's alleged to have actually helped to facilitate this loan. What about the other two directors, the other two officers? Again, given the scrutiny on the company, given the scrutiny on the company, given that this is a raging issue and there are serial denials of investigation of loans to criminals, it's obvious that the company would have known about these issues, would have investigated and known about these issues prior to rendering a denial. Including all the individual defendants? Yes, all the individuals, the CEO, the CFO, and relevant defendants. Thank you very much. Thank you both, Mr. Steegey, Mr. Lieberman, for your oral argument presentations here today. The case of David Grigsby. Excuse me. Judge McKay, before you go on to the next case, could I have a two-minute break? Yes. Let me just submit this case and then we'll have a two-minute break. The case of David Grigsby and Barr Mandel Levy versus BFI Holding Incorporated and BFI Investors Group is now submitted. We'll take two minutes and then resume. Thank you. Thank you, Your Honors.
judges: Murguia, Christen, Hellerstein